IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUSANNE ATANUS, )<br><br>Plaintiff, )<br><br>v. )<br><br>STEPHEN A. PERRY, )<br>Administrator, General Services )<br>Administration, )<br><br>Defendant. ) | No. 04 C 7512<br><br>Judge Mark Filip |

## MEMORANDUM OPINION AND ORDER GRANTING
## GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Susanne Atanus ("Plaintiff" or "Atanus"), filed this lawsuit against Stephen A.

Perry, Administrator in the United States General Services Administration ("GSA" or

"Defendant"). Ms. Atanus alleges violations of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e, et seq., and the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621, et seq. (D.E. 1 ("Cmplt.").)[1] Ms. Atanus claims that the Defendant discriminated

against her in violation of Title VII (Counts I - V) and the ADEA (Count VI and VII) because her

race (Caucasian), color (white), religion (Catholic), gender (female), national origin (Assyrian)

and/or age allegedly were motivating factors in Defendant taking adverse employment actions

against her and/or retaliating against her for complaining of such discrimination. The case is

before the Court on the Defendant's Motion for Summary Judgment (also "Motion"). (D.E. 32.)

For the reasons stated below, Defendant's Motion is granted.

---

[1] The designation "D.E." refers to the docket entry number of the cited document followed by the
appropriate page or paragraph number.

## RELEVANT FACTS[2]

Plaintiff alleges (and Defendant does not dispute) that she is a white, Catholic, Caucasian female of Assyrian descent born in 1958. (D.E. 1.) Plaintiff started working for GSA in 1984 as a contract administrator with the Federal Supply Service in the Contract Management Division of GSA's Contract Administration Branch in its Chicago, Illinois office. (D.E. 37 ¶ 1.) In 1995, Ms. Atanus was transferred to a contract specialist position, which requires "extensive contact with contractor representatives . . . and other parties outside the government." (*Id.* ¶¶ 3-5.) Plaintiff's supervisor began to observe problems with Ms. Atanus's conduct while Ms. Atanus worked as a contract specialist, and Ms. Atanus began to receive disciplinary actions. (*Id.* ¶ 6.)

---

[2] The Court takes the relevant facts from "GSA's Local Rule 56.1 Statement of Facts" ("Def. SF") (D.E. 34); "Plaintiff's Local Rule 56.1 Response and Statement of Material Facts Supporting Denial of Defendant's Motion for Summary Judgment" ("Pl. Resp. to Def. SF") (D.E. 37); and "GSA's Reply to Plaintiff's Local Rule 56.1 Statement." ("Def. Resp. to Pl. SF") (D.E. 44). Where the parties disagree over relevant facts, the Court, as appropriate, sets forth the competing versions. In addition, the Court, as it must, resolves genuine factual ambiguities in the non-movant's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). Local Rule 56.1 ("L.R. 56.1") requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g., Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. *See, e.g., Malec*, 191 F.R.D. at 583 ("[A] movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions."); *id.* ("Factual allegations not properly supported by citation to the record are nullities."). Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. *See* L.R. 56.1(a), (b)(3)(B); *see also Malec*, 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). The Court also disregards any additional facts asserted in the Parties' responses to L.R. 56.1 statements and in their briefs, as such filings are not appropriate vehicles to present additional facts within the Rule 56.1 framework. *See, e.g., Knights v. Williams*, No. 02 C 5017, 2005 WL 1838427, at *2 (N.D. Ill. July 28, 2005) (collecting cases); *see also Malec*, 191 F.R.D. at 584 (L.R.56.1(b)(3)(B) statement is the only acceptable means of presenting additional facts to the Court). Within its "Reply to Plaintiff's Local Rule 56.1 Statement," Defendant has moved to strike portions of Plaintiff's response to its Rule 56.1 statement. (D.E. 44.) Rather than rule at length on whether to strike the individual paragraphs identified by Defendant, the Court will draw only from the portions of the responses that are appropriate, and it will ignore any inappropriate and/or unsupported denials or improper additional statements of fact.

Between 1999 and 2001, Plaintiff received a number of disciplinary reprimands regarding her workplace conduct. (*Id.* ¶¶ 8-19.)

On June 11, 2001, she was reassigned to what is termed an "unassembled set of duties," meaning a set of duties and responsibilities that have not been classified by GSA as a formal position. (*Id.* ¶¶ 20-21.) GSA offers evidence that Plaintiff was reassigned in this manner to fill a void left by another employee who had died and to minimize Plaintiff's contact with external customers. (*Id.* ¶¶ 20-22.) Following this reassignment, Plaintiff continued to be subject to disciplinary actions, with her supervisor testifying that she observed "problems" with Plaintiff's work conduct and numerous other GSA employees testifying to what they believed was inappropriate, insulting, and/or threatening workplace conduct by Plaintiff, which behavior Plaintiff generally or at least often denies. (*Id.* ¶¶ 24-69.) Instead, Plaintiff contends that two of the disciplinary actions taken against her, a ten-day suspension for disorderly conduct from December 2, 2002 through December 13, 2002, and a "letter of instruction" dated January 13, 2003, violated Title VII and/or the ADEA because they were based on her race, color, religion, national origin, gender and/or age. (D.E. 1 at Counts I(a-b)) through VII (a-b).) In addition Plaintiff claims that she was verbally harassed at a meeting in February 3, 2003 because of her race, color, religion, national origin, gender and/or age. (*Id.* at Counts I(c)) through VII (c).)

On December 17, 2002, the parties agree that Plaintiff requested that GSA conduct a "desk audit" of the work she was doing, which consists of a personnel specialist interviewing an employee and supervisor and determining whether the employee's position is properly classified. (D.E. 37 ¶¶ 70, 71.) Plaintiff was then advised that a desk audit could not be performed while she was assigned to an unassembled set of duties, in response to which Plaintiff requested an official position. (*Id.* ¶¶ 72-73.) The Parties disagree about what exactly happened as a result of

3

Plaintiff's request. However, Defendant asserts, and Plaintiff agrees, that Ms. Brown, Plaintiff's supervisor, "then began on January 17, 2003, to work with Human Resources to develop a position description specifically for the work Atanus was doing and the result was that Atanus was issued the new position of procurement analyst beginning in April 2003." (*Id.* ¶ 74.)

This transfer to the procurement analyst position is the basis for Ms. Atanus's putative retaliation claim. To the extent that the agreed factual scenario related immediately above is accepted to explain the genesis of Ms. Atanus's service as a procurement analyst (and it is hard to see, given Plaintiff's agreement with Defendant's well-supported factual assertion, how accepting it would be unfair), that would seem to be the end of the matter concerning Plaintiff's retaliation claim. (Put differently, it is hard to see how someone (here, Defendant) can be retaliating against a person (here, Plaintiff) by granting their request.) However, in the interests of completeness, the Court notes that in other portions of the record, Plaintiff appears to assert that in early 2003 she was first assigned to the position of "Contract Specialist," as a "GS-11," and then, after filing a formal complaint of discrimination against her employer, was reassigned to the position of "Procurement Analyst," also a "GS-11" position. (D.E. 44 at Resp. to ¶ 32; *see also, e.g.,* D.E. 36 at 5 (explaining that the procurement analyst position was also a "GS-11" position); D.E. 37-3 at 59 (Ms. Atanus explaining at her deposition that both positions were within the GSA "contract administration branch," and that procurement is "a subdepartment of [the] contract management division").) Ultimately, as addressed below, this putative factual ambiguity is not legally material, as Plaintiff has failed to offer any evidence that a sub-departmental switch within the same agency department, at the same GS level, in the same geographic location, constitutes an adverse employment action sufficient to trigger the strictures of the federal employment laws.

Plaintiff filed a compliant with the GSA's Regional Equal Employment Opportunity ("EEO") Office, in which she alleged discrimination based on her race, color, religion, national origin, gender, and age. (D.E. 1, Ex. A.) Plaintiff received a notice of final action on this EEO complaint on August 23, 2004, and she filed her Complaint in this action on November 22, 2004. (D.E. 1.) In conjunction with the discrimination she alleges, Plaintiff also alleges that she was subject to retaliation for engaging in protected activity, namely filing her EEO complaint on March 5, 2003, in violation of Title VII and the ADEA. (D.E. 1 at Counts I(d)) through VII (d).)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004) (citation omitted). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## DISCUSSION

Defendant moves for summary judgment against Ms. Atanus's claims. For the reasons stated below, Plaintiff's claims, on the summary judgment record assembled, are defective—

most of them for multiple, independent reasons—as a matter of law. Defendant's summary judgment motion is granted and Ms. Atanus's case is respectfully dismissed.

**I.    Ms. Atanus Does Not Establish A Prima Facie Case on Her Title VII and ADEA Claims of Discrimination, Nor, Independently, Does She Present Any Evidence That Defendant's Non-Discriminatory Explanations For Its Actions Are Pretextual**

Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). "The two accepted ways of establishing that an employer violated this prohibition are: first, by direct evidence . . . or second, indirect evidence." *Hasham v. California State Board of Equalization*, 200 F.3d 1035, 1044 (7th Cir. 2000) (citing *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).

With respect to proof via direct evidence, caselaw establishes that direct proof of discrimination is relatively difficult to adduce. In this regard, the Seventh Circuit has defined direct evidence in the employment law context as evidence which, if believed by the trier of fact, will prove the particular issue in question without reliance on inference or presumption. *See, e.g., Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir.2003) (citations omitted). The Seventh Circuit has repeatedly counseled that "[d]irect evidence usually requires an admission by the decisionmaker that his actions were based on" the illicit decision-making criterion. *Balderson v. Fairbanks More Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir.2003); *see also Rogers*, 320 F.3d at 753 (stating that direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus.") (internal quotation marks and citation omitted). The Seventh Circuit has explained that evidence of this sort is exemplified by statements such as "'I fired you because of your age'" or because of another illicit

decision-making criterion. *Robin v. Expo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir.2000) (citation omitted); *accord, e.g.*, *Castleman v. ACME Boot Co.*, 959 F.2d 1417, 1420 (7th Cir.1992) (teaching that direct evidence will "rarely" be found).

Precedent further teaches that, "[b]ecause employers are usually careful not to offer smoking gun remarks indicating intentional discrimination, the Supreme Court established the burden shifting approach as a means of evaluating indirect evidence of discrimination." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).[3] "In either case, the burden is on the plaintiff to demonstrate genuine issues exist for trial." *Markel v. Board of Regents of University of Wisconsin Sys.*, 276 F.3d 906, 910 (7th Cir. 2002) (citation omitted).

### A. Plaintiff Offers No Direct Evidence of Discrimination

The only evidence Plaintiff offers that might conceivably be considered "direct" evidence of discrimination, albeit only when construed very broadly, is her claim that in 1996 Debra Wauchop (Plaintiff's then supervisor) allegedly asked Plaintiff during lunch, "what's your nationality," to which Plaintiff replied: "Assyrian." (D.E. 37 ¶ 8.) Plaintiff contends that Ms. Wauchop then remained silent for the remainder of the meal. (*Id.*) Defendant admits that Ms. Wauchop and Plaintiff had lunch, but denies that the subject of Plaintiff's nationality was discussed. (D.E. 44 at Resp. to ¶ 8.)

Even taking this allegation by Plaintiff as true, however, it does not rise to the level of direct evidence of discrimination. First, it is not anything from which one could infer discriminatory animus without inference or presumption, as precedent requires. Ms. Wachop is

---

[3] Similarly, the ADEA prohibits intentional discrimination against individuals older than age 40. 29 U.S.C. § 621(b). A plaintiff may prove age discrimination under either the direct or indirect method. *See Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 468 (7th Cir. 2000) (affirming grant of summary judgment where there was a legitimate reason for claimant's termination and no evidence of pretext).

not alleged to have made any derogatory statement about Assyrians, or Catholics, or women, nor did she allegedly express anything that, by implication, could be understood as a negative appraisal of individuals who might fit into such groups.

In addition, and independently, the question about Ms. Atanus's nationality allegedly occurred at least five years before any of the events Plaintiff complains about here. That is far too long under applicable precedent to create a triable case of discrimination under the direct method. *See, e.g., Markel*, 276 F.3d at 910 (finding that alleged statements made two months before complained of termination could not be considered direct evidence of discrimination because they were too remote to the adverse action) (collecting Seventh Circuit cases). Therefore, because Plaintiff fails to offer direct evidence of race, color, gender, religious, national origin or age discrimination, she must proceed under the *McDonnell Douglas* burden-shifting framework. *Accord, e.g., Conley v. Village of Bedford Park*, 215 F.3d 703, 711 (7th Cir. 2000) ("To rise to the level of direct evidence of discrimination, this Court has stated that isolated comments must be contemporaneous with the [adverse action] or causally related to the [applicable] decision-making process. ") (internal quotation marks and citations omitted; brackets in *Conley*).

**B.** **Plaintiff Fails to Establish a Prima Facie Case of Discrimination Through Indirect Evidence or To Present Any Evidence of Pretext**

Under the *McDonnell Douglas* framework, to establish a prima facie case of discrimination under Title VII and/or the ADEA, Plaintiff must put forth evidence that: (1) she belongs to a protected class, (2) she performed her job according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly-situated employees outside the protected class were treated more favorably by the defendant. *See, e.g., Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). If Ms. Atanus presents

8

a prima facie case of discrimination, the burden shifts to Defendant to articulate legitimate, nondiscriminatory reasons for the actions taken against her. *See, e.g., id.* at 978-979. If the Defendant offers a legitimate explanation, the inference of discrimination disappears, and to survive summary judgment, Ms. Atanus must demonstrate that there is an issue of triable fact as to whether Defendant's proffered reasons were a pretext for intentional discrimination. *See, e.g., id.* The ultimate burden to prove intentional discrimination remains with Plaintiff. *See, e.g., Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001) (citation omitted).

> 1. *Plaintiff Fails to Either Present a Prima Facie Case of Discrimination With Regard To Her 10-Day Suspension in December 2002 or To Present Any Evidence That Defendant's Non-Discriminatory Reason For the Suspension Was Pretextual*

Plaintiff claims that Defendant violated Title VII when it suspended her for ten work days in December 2002. (D.E. 36 at 8.) The parties agree that the events relating to this suspension more or less commenced in August 2002. That was when Plaintiff's then-supervisor, Karen Brown, issued a letter proposing to suspend Ms. Atanus from duty for disorderly conduct at a meeting on July 16, 2002 between Plaintiff and her "team leader," Denise Henderson. (*See, e.g.,* D.E. 37 at Resp. to ¶ 27 & referenced Ex. B at 1-2.) Subsequently, on September 12, 2002, Richard Smith, a high-level supervisor of Plaintiff, contacted Plaintiff to schedule an in-person meeting and discuss the suspension Ms. Brown had proposed. (D.E. 37 at Resp. to ¶ 31.) In response, Plaintiff stated that she had done nothing wrong and did not need to meet with Mr. Smith in person. (*Id.* at Resp. to ¶ 32.)[4] Mr. Smith insisted that they meet, and a meeting was scheduled for 2 p.m. that afternoon. (*Id.* at Resp. to ¶ 33.) Prior to the appointed meeting time,

---

[4]     Although first admitting this well-supported fact, Plaintiff "clarifies" that she "asked whether the meeting would be necessary." (D.E. 37 at Resp. to ¶ 32.) The distinction is irrelevant to the Court's decision.

at 11:45 a.m., Plaintiff "walked into Smith's office and began discussing the proposed suspension." (*Id.* at Resp. to ¶ 34.)

The parties dispute the substance of this September 12, 2002 meetings, with Defendant claiming that Plaintiff "argued about the issues in the proposal and would not leave until Smith finally told her that a federal protective officer would remove her if she would not leave of her own accord." (*Id.* at Resp. to ¶ 36.) In contrast, Plaintiff claims that "she discussed the issues, and upon receiving no feedback other than Smith's threat that he would call Federal Protective Services, . . . [she] left the meeting." (*Id.*) Although the parties disagree over some of the details about the ensuing events, they agree that Plaintiff and Smith discussed the proposed five-day suspension some four additional times in the next two days. Three of these conversations were initiated by Plaintiff and two of them ended with Plaintiff refusing to leave Mr. Smith's office until he threatened to call a Federal Protective Officer if she did not. (*See id.* at Resp. to ¶¶ 37-57.) Plaintiff admits that, in the course of these discussions, she told Mr. Smith "of her religious affiliation" and that "she did not believe Christians would act in this manner." (*Id.* at Resp. to ¶ 39.) In addition, the parties agree that Plaintiff told Smith that "if he was a person of God," he would not suspend her and that Mr. Smith informed Plaintiff that he was offended by this comment.[5] (*Id.* at Resp. to ¶¶ 50-51.) The parties also agree that during the course of these conversations, Plaintiff, when told there was nothing further to discuss, "said she would not leave [Mr. Smith's] office," and argued, at some point, that she was "the smartest person in the building, she worked very hard and it was not fair to do this to her." (*Id.* at Resp. to ¶¶ 52, 45.)

---

[5] Plaintiff does not argue that Smith's claimed offense at her comment that a Christian and/or a person of God would not suspend her is evidence of prima facie religious discrimination. (D.E. 36.) Even if she did, this isolated reaction to her statement would not remotely create a triable employment discrimination case on the record presented.

Plaintiff also told Mr. Smith that *he* "should be the one suspended because he was not doing his job properly, and that she was going to call Steve Parry, GSA's Administrator, to reverse Smith's decision." (*Id.* at Resp. to ¶ 41.) Although Plaintiff denies actually acting in a loud, threatening or aggressive manner during the course of these discussions, Ms. Atanus does not dispute that she pointed her finger at others, and raised her voice, and Mr. Smith offers evidence that he certainly perceived her as acting in a loud, aggressive, and threatening manner. (D.E. 34 ¶¶ 38, 43, 49; D.E. 44 at Resp to ¶¶ 38, 43, 49.)

Mr. Smith made a written record of the various conversations he had with Plaintiff regarding the proposed suspension and gave it to Ms. Brown. (D.E. 44 ¶ 58.) On October 21, 2002 Ms. Brown issued Plaintiff a disciplinary action, this time proposing a ten-day suspension for what she termed "disorderly conduct" during Plaintiff's conversations with Mr. Smith, a high-level supervisor. (*Id.* at Resp. to ¶ 58-60.) On November 19, 2002, Debra Wauchop reviewed and sustained the ten-day suspension. (D.E. 37 at Resp. to ¶ 61.) In the course of sustaining the suspension, Ms. Wauchop confirmed with "GSA's human resources employees, specifically Jackie Womack, a human resources specialist, and Lisa Pearson, a labor relations officer, to verify that the proposed ten-day suspension was consistent with the [GSA] penalty guide." (D.E. 44 ¶ 68; *see also id.* ¶¶ 62-64, 67 (discussing penalty factors upon which Ms. Wauchop relied).)

In regard to the *McDonnell Douglas* factors, Defendant does not seem to dispute that Plaintiff belongs to various protected classes and that the 10-day suspension is an "adverse job action" for Title VII purposes. Rather, Defendant asserts that Plaintiff has failed to show that similarly-situated employees outside the protected classes were treated more favorably than her and also has failed to show that GSA's reason for the disciplinary action was pretextual.

11

Defendant is correct on both points, and summary judgment on the claim is independently warranted on both bases.

The Court agrees with Defendant that Plaintiff has failed to establish a prima facie case of discrimination. Without regard to whether Plaintiff was performing her job according to her employer's legitimate job expectations, which the parties dispute, Plaintiff has failed to show that similarly-situated employees who reacted similarly to disciplinary actions were treated any more favorably than Plaintiff. Plaintiff admits that during her meetings with Mr. Smith she refused to leave his office, accused him of doing his job improperly, and indicated that he would be acting in a sacrilegious manner if he were to suspend her. She has offered no evidence that other employees who acted in similar ways were subjected to less severe discipline and therefore she has failed to offer a prima facie case of discrimination.

In this regard, a "similarly situated" individual is one who is "directly comparable to [the plaintiff] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (collecting cases). Where an employee claims that she was disciplined by her employer more harshly than another employee, she "must show that [she] is similarly situated with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (citation omitted). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18 (citation omitted). Plaintiff has offered no evidence of other employees, who were "directly comparable" to her "in all respects," and any lesser disciplining or non-disciplining of those comparators. *Patterson*, 281 F.3d at 680.

For this reason, Plaintiff has failed to present a prima facie case of discrimination in relation to the ten-day suspension. *See, e.g., Patterson v. Omni Super Store,* No. 97 C 7546, 1999 WL 116212, *6 (N.D. Ill. Mar. 2, 1999) (Kocoras, J.) (granting defendant's motion for summary judgment where evidence showed that Plaintiff acted inappropriately and "[n]o evidence exists that [allegedly similarly situated employee's] behavior was improper."); *see also Brown v. Society for Preservation and Encouragement of Barber Shop Quartet Singing in America, Inc.,* 113 F. Supp. 2d 1311, 1316 (E.D. Wis. 2000) (granting summary judgment and finding that plaintiff had failed to identify any similarly situated employees who were treated more favorably where the only other employee who was involved in workplace altercation "had always been an employee in good standing with the Society," whereas employer already "had been hearing complaints regarding [plaintiff's] ability to get along with co-workers").

In addition, and independently, Defendant has offered a legitimate non-discriminatory explanation for its decision to suspend Plaintiff for 10 days and Plaintiff has failed to show that this explanation is pretextual. First, Defendant offered evidence of its belief that Plaintiff failed to properly handle a FOIA request. (D.E.34 ¶ 28.) Second, and independently, Defendant has offered testimony that Plaintiff's suspension was based on various conduct (and this part of the factual record is not disputed) that included: Plaintiff's refusal to leave Mr. Smith's office when discussing the possible suspension; Plaintiff telling Mr. Smith that he (as opposed to Plaintiff) actually was the one who should be suspended; Plaintiff's accusing Mr. Smith of not doing his job properly; and Plaintiff's expression to Mr. Smith that he would be acting in a sacrilegious manner if he suspended her. (D.E. 37 at Resp. to ¶¶ 29-60.) Although Plaintiff asserts that she was not acting in an inappropriate or objectionable manner toward Mr. Smith in the course of her interactions with him, the agreed facts alone indicate that Defendant has presented a legitimate

non-discriminatory reason for suspending Plaintiff. *See Patterson*, 1999 WL 116212 at *7 (finding no evidence of pretext where defendant presented evidence that plaintiff was fired for engaging in "two heated discussions with his supervisors").

In response to the extensive evidence of a non-discriminatory basis for Defendant's suspension of Plaintiff, Plaintiff does not present any evidence that Defendant's asserted basis for its decision is actually a pretext for discrimination; instead, as indicated, Plaintiff argues that she does not believe she acted inappropriately, or otherwise disputes even more assertions of *other* alleged inappropriate conduct by Plaintiff that Defendant's employees put forward. Under federal law, however, Plaintiff's response is inadequate. Precedent repeatedly instructs that, under Title VII, "the focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) (collecting cases). The Seventh Circuit also has instructed repeatedly that arguing about whether a company was correct or not concerning an honestly held basis for an employment decision is "a distraction." *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 900 (7th Cir. 1999) (teaching that "it simply does not matter whether Green actually manipulated her records so long as National had a good faith basis to believe that she had done so"); *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677-78 (7th Cir. 1997) (similar); *see also Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) ("[A] pretext for discrimination . . . means something worse than a business error; pretext means deceit used to cover one's tracks.") (internal quotation marks and citation omitted); *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) ("[P]retext means a dishonest explanation, a lie rather than an oddity or an error.") (citation omitted). Without offering anything more than her own self-assessment that her various supervisors were incorrect in believing that her behavior was

14

inappropriate or threatening, Plaintiff's discrimination claims related to the ten-day suspension cannot survive Defendant's motion for summary judgment because she fails to provide any evidence of pretext. *See, e.g., Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (teaching that an employee cannot create a triable case of alleged discrimination simply by disagreeing with his employer about whether the employee was performing well) (collecting cases). Plaintiff presents no evidence whatsoever that would indicate that her supervisors did not honestly believe that she acted insubordinately and inappropriately. As a result, Ms. Atanus has failed to show that Defendant's non-discriminatory basis for suspending her was pretextual. *See, e.g., Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) (affirming grant of summary judgment on Title VII and ADEA claims and stating that, although defendant-employer arguably "overreacted and unnecessarily fired an employee with an otherwise competent performance record," "[n]evertheless, it is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice.").[6]

> 2. *Plaintiff Fails to Present a Prima Facie Case of Discrimination With Regard To The January 13, 2003 "Letter of Instruction" And To Present Any Evidence That Defendant's Non-Discriminatory Reason For the Letter Was A Pretext For Discrimination*

The Parties agree that Ms. Brown issued Plaintiff a "Letter of Instruction" on January 13, 2003. (D.E. 37 at Resp. to ¶ 75.) The letter alleges that Plaintiff was not following proper guidelines for modifications and extensions of contracts. (*Id.* at Resp. to ¶¶ 75-76.) Defendant

---

[6] Although Defendant certainly need not make this additional showing under the law to prevail in the pretext analysis—*see, e.g., Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006)—it is worth noting that in most employment settings, an employee would have been summarily terminated for at least some of the conduct that Ms. Atanus acknowledges. Generally speaking, no matter what one thinks of one's boss (or, to be more accurate in the instant context, one's boss's boss), telling him or her that they are doing their job improperly, should be suspended, and will be engaging in improper and sacrilegious conduct if they take action against you, is typically a basis for a quick exit from an employment position.

contends that Plaintiff had similarly departed from the proper guidelines in the past, and, as a result, Mr. Brown "believed the letter of instruction was warranted." (*Id.* at Resp. to ¶ 77.) Plaintiff has failed to establish a prima facie case that Defendant violated Title VII when it issued this letter because Plaintiff has failed to show that the letter was a material adverse employment action and, independently, because Plaintiff has failed to show that similarly situated employees outside of her protected classes were treated more favorably. In addition, her claim relating to the letter independently fails at summary judgment because Plaintiff has failed to present any evidence that Defendant's non-discriminatory reason for issuing the letter was pretextual.

Adverse employment actions include "actions such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or some other action causing a significant change in benefits.'" *McKenzie v. Milwaukee County*, 381 F.3d 619, 625 (7th Cir. 2004) (quoting *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *accord Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999) ("A tangible employment action has to cause a substantial detriment to the plaintiff's employment relationship. As the Supreme Court stated: 'A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits'") (quoting *Ellerth*, 524 U.S. at 761 (emphases in *Savino*)). "To be actionable, an employment action must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *McKenzie*, 381 F.3d at 625 (quoting *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002)).

Plaintiff has failed to present any evidence that Defendant's issuance of the January 13, 2003 letter of instruction caused her material harm or resulted in any tangible job consequences and, as a result, her Title VII and ADEA claims relating to its issuance cannot get past the

16

starting gate. *See, e.g., Oest v. Illinois Dept. of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) ("Nor do we believe that the oral or written reprimands received by Ms. Oest under the Department's progressive discipline system can be considered, on this record, as implicating sufficiently 'tangible job consequences' to constitute an independent basis of liability under Title VII.") (citing *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) (teaching that, absent a "tangible job consequence accompanying [the allegedly unwarranted and retaliatory] reprimands, we decline to broaden the definition of adverse employment action to include them.")).

In addition, and independently, even if the January 13, 2003 "Letter of Instruction" were an adverse employment action, and the Court specifically finds that it was not, Plaintiff has failed to identify any similarly situated employees outside her various protected classes that were treated more favorably in the face of similar circumstances. Plaintiff argues that various employees outside her protected classes were issued Letters of Instruction regarding "similar contractual matters" and that the letters those employees received were "shorter," have a "softer tone," and allow the recipients more time to correct the issues without being "threatened with losing their job, told immediately to correct the problem, or seek assistance . . . ." (D.E. 36 at 9-10.) With all respect, the Court fails to see how these distinctions are material within the parameters set by precedent. The fact, as Plaintiff presents it, is that these other employees were issued "Letters of Instruction" when Defendant believed that they had failed to appropriately deal with contract matters, just as Plaintiff was. (D.E. 36 at 9-10; D.E.. 37, Ex. 6.) Therefore, even if these employees were similarly situated to Plaintiff—and, as explained below, Plaintiff fails to make that showing as well—those other individuals were not treated more favorably than she was. (*Id.*) Plaintiff's allegation that the letters they were received were somehow "softer" in "tone" does not affect this analysis. Federal courts "do not sit as a super-personnel department

17

that reexamines an entity's business decisions," let alone sit to correct word choice or tone in simple warnings issued to employees. *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004) (internal quotation marks and citation omitted). This Court, therefore, will not engage in such reexamination by parsing the "length" and "tone" of disciplinary letters when the parties agree that those who engaged in allegedly similar behavior were disciplined by receiving letters to the same general effect. *See, e.g., Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1220 (7th Cir. 1991) (holding that an employer's practices, including its hiring and firing practices, can, for better or worse, be "medieval," "high-handed," and "mistaken," so long as they are not based on discriminatory reasons), *overruled in part on other grounds by Oxman v. WLS-TV*, 12 F.3d 652 (7th Cir. 1993).[7]

In addition, and again independently with respect to the prima facie case analysis, Plaintiff has failed to show that the three other employees who received letters are similarly situated to Plaintiff. Plaintiff received her letter from Kim Brown, who was the Acting Chief of the Contract Administration Branch at the time, whereas the other recipients all received their letter from Debra Wauchop, who was the Chief of the Contract Administration Branch when she wrote the other letters some twelve months earlier. (*See* D.E. 37-6, Pl. Ex. 5; D.E. 37-7, Pl. Exs. 6.) To show substantial similarity, a plaintiff must show that the proffered comparator is "similarly situated with respect to performance, qualifications, and conduct." *Radue*, 219 F.3d at 617. In this regard, precedent teaches that the substantial similarity showing "normally entails a showing that the two employees dealt with the same supervisor . . . ." *Id.* at 617-18 (citation

---

[7] In some respects, one might argue that the letter Plaintiff received is friendlier than those received by other employees. For example, in the letter Plaintiff received, the letter-writer, Kim Brown, the Acting Chief of the Contract Administration Branch, took the time to specifically advise Plaintiff of confidential counseling resources available from the Employee Assistance Program. (D.E. 37-6, Pl. Ex. 5 at 3.) The other letters, which were written a year earlier by Debra Wauchop, did not advise the recipients of such resources. (D.E. 37-7, Pl. Ex. 6.)

omitted). Plaintiff was admonished by a different supervisor than the putative comparators. As a result, because two different people wrote the letters, any difference in "tone" (and it would be difficult to imagine that there would not be at least some difference in "tone" any time two different people wrote letters to employees about a subject) is not evidence of invidious discrimination.

Additionally, and again independently, Plaintiffs' claims in relation to the January 13, 2003 letter fail because even if she were able to prove a prima facie case of discrimination (and the Court specifically finds that she has not), she has failed to introduce any evidence that Defendant's proffered reason for issuing the letter—that she was mishandling contract modifications—was pretextual. Plaintiff argues that "a comparison of Letters of Instruction regarding similar contractual matters issued to Atanus and those issued to her coworkers . . . reveals that the Agency's proffered nondiscriminatory reason is simply pretextual in nature," arguing again that the other letters were softer in tone and less threatening. Plaintiff fails to cite a single case in which any court has find this type of comparison as evidence of pretext, and the Court's research does not reveal any.

Instead, as discussed above, the Seventh Circuit instructs that this Court should not reexamine the propriety, correctness, or wisdom of otherwise lawful personnel decisions. *See Davis*, 368 F.3d at 785 (citation omitted). That is the case because, precedent teaches, "the focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Id.* at 784 (internal quotation and citation omitted). Put differently, under Title VII and the ADEA, a company can be mistaken about a reason that led to an adverse employment action, so long as the company's decision was not motivated by ageism, sexism or bigotry. For this reason, the Court declines again to parse the language and tone of the

"Letters of Instruction" issued to Plaintiff and other employees. For present purposes, it is enough that Plaintiff has failed to present evidence that Defendant acted on anything but good faith in its belief that a letter of instruction was warranted by what it believed to be Plaintiff's failure to comply with regulations regarding contracts, and that it issued her a "Letter of Instruction" based on its belief that she had similarly failed to comply in the past. *See Green*, 197 F.3d at 899 ("[I]f an employer acted in good faith and with an honest belief, we will not second-guess its decisions") (collecting cases). Therefore, because Plaintiff has not offered evidence that creates a triable issue as to whether Defendant's stated reason for issuing the January 13, 2003 "Letter of Instruction" is pretextual, summary judgment is appropriate. *Accord, e.g., Davis*, 368 F.3d at 784 ("[A] pretext for discrimination . . . means something worse than a business error; pretext means deceit to cover one's tracks.") (internal quotations and citations omitted)).

> 3.    *Plaintiff Fails to Present Any Evidence Indicating that the Verbal Harassment She Claims To Have Been Subjected to on February 3, 2003 Violated Title VII or The ADEA*

Plaintiff alleges that Defendant discriminated against her in violation of Title VII and the ADEA when she suffered "[v]erbal harassment during a meeting with the Acting Branch Chief of the Contracts Administration Branch on February 3, 2003." (D.E. 1.) There are several ways to frame Title VII claims and, with all respect, it is not entirely clear from Plaintiff's Complaint how she intended to frame her claim with regard to the February 3, 2003 meeting. However, as Plaintiff alleges that she perceived comments made during a meeting on this date as "discriminatory and harassing," the Court considers her claim as broadly as possible, including considering it as a "hostile work environment" claim. *See Cooper-Schut v. Visteon Automotive*

*Sys.*, 361 F.3d 421, 426 (7th Cir. 2004) (stating that "an employer violates Title VII if it is responsible for a 'hostile work environment.'") (citation omitted).

Attempting to avoid summary judgment on these claims, Plaintiff argues that during this meeting, Kim Brown and Denise Henderson (both of whom she describes as "Black") "verbally harassed" her and "badgered her in a loud, unprofessional tone," which Plaintiff "subjectively perceived as discriminatory and harassing." (D.E. 36 at 11.)[8] Plaintiff offers no evidence about the actual words that were used or the reason that she believes they evince or relate to discrimination motivated in any way by her race, color, religion, national origin, gender, and/or age.

With all respect, Plaintiff's allegations that Defendant violated Title VII during the February 3, 2003 meeting cannot, on the record presented, be seriously entertained. As discussed above, this "harassment" is not the kind of adverse job action that could support a claim for discrimination under Title VII or the ADEA, as Plaintiff has offered no evidence that she suffered any harm or tangible job consequence as a result. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (teaching that Title VII is not a code of general civility, and that simple teasing, offhand comments, and isolated incidents that are not extremely serious do not amount to actionable harassment); *McKenzie*, 381 F.3d at 625.

Neither can these allegations support a claim that Plaintiff was subjected to a hostile work environment in violation of Title VII and/or the ADEA. To prove that a hostile work environment existed, Plaintiff must put forth sufficient evidence that she "was subjected to conduct so severe or pervasive as to alter the conditions of employment and create an abusive

---

[8] Defendant admits that Plaintiff met with Kim Brown and Denise Henderson, but "clarifies that the referenced meeting took place on February 13, 2003." (D.E. 44 at Resp. to ¶ 26.) For consistency's sake, the Court refers to the meeting as the "February 3, 2003" meeting, although the distinction between the two dates is immaterial to the analysis herein.

working environment." *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004) (internal quotation marks and citations omitted). The very case on which Plaintiff relies in attempting to resist summary judgment holds that "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). In this regard, the Seventh Circuit has explained that, "[t]he workplace that is actionable is the one that is hellish." *Wyninger*, 361 F.3d at 977 (collecting cases; internal quotation marks and citations omitted). In determining whether Ms. Atanus's work environment was objectively hostile, the Court "must consider all of the circumstances, including the frequency and severity of the conduct; whether it was threatening and/or humiliating or merely an offensive utterance; and whether the harassment unreasonably interfered with her work." *McPherson*, 379 F.3d at 438 (citing *Wyninger*, 361 F.3d at 975-76).

Plaintiff has failed to discharge her burden of showing that there is a triable question concerning whether she was subjected to a hostile workplace as a consequence of the meeting in question. Plaintiff has alleged that she was subjected to the unspecified harassing behavior on only one occasion (February 3, 2003) and does not present any evidence that it was either threatening or humiliating, or that it interfered with her work—this seems far, therefore, from the "hellish" environment the Seventh Circuit has found actionable. Moreover, cases abound in which courts have granted summary judgment in the face of undisputed allegations relating to hostile work environments more severe than the one isolated incident in which Plaintiff complains she was "verbally harassed" and "badgered [] in a loud, unprofessional tone." *See, e.g.*, *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005) (granting summary judgment and finding that, even if true, plaintiff's allegations that another employee

engaged in a "daily non-ceasing quest to denigrate" female employees, which included incidents in which he "spoke down to her and other female employees," "made a reference to her 'tits,'" made various juvenile remarks or jokes about penises, and "told several new male employees to watch out because Ms. Moser likes good-looking men," did not rise to the level of creating an objectively hostile work environment); *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999) (rejecting hostile workplace claim under ADA, where two intermediate supervisors variously called him a "useless piece of [vulgarity]," a "medical abuser," intimated that they should "kick his [vulgarity]" for malingering, and made references to his "[vulgarity] medical problems," and holding that it did not constitute actionable harassment because "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment.'"") (quoting *Faragher*, 524 U.S. at 788; further internal punctuation and citation omitted); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (overturning a jury verdict and finding no actionable harassment when the employer "never touched the plaintiff. He did not invite her, explicitly or by implication, to have sex with him, or to go out on a date with him. He made no threats. He did not expose himself, or show her dirty pictures. He never said anything to her that could not be repeated on primetime television."); *see also Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001) (finding that plaintiff's work environment did not rise to the level of "hostile" on an ADEA claim where "[b]ased upon the record before us, Caterpillar officials may have been rude or unfair to Bennington. However, absent more facts this conduct does not rise to the level of legally redressible discrimination."). The Court has no basis to conclude that the unspecified "badgering" and verbal "harassment" Plaintiff alleges, even if true, rise to the level of an objectively hostile or abusive work environment. Nor has Plaintiff offered any evidence that they

related to her race, color, national origin, gender, religion and/or age. Defendant is thus entitled to summary judgment on Plaintiff's claims relating to any alleged "verbal harassment" on February 3, 2003.

## II. Ms. Atanus Also Does Establish A Prima Facie Case on Her Title VII and ADEA Claims of Retaliation, Nor Does She Present Any Evidence That Defendant's Non-Discriminatory Explanations For Its Actions Are Pretextual

In addition to the claims discussed above, Plaintiff alleges that she was discriminated against in violation of Title VII and the ADEA in that she was subject to "[r]etaliation due to prior EEO activity," "when on March 13, 2003, Atanus was informed that effective April 1, 2003, she was being reassigned to the position of Procurement Analyst, GS-1102-11 from her previous position of Contract Specialist, GS-1102-11." (D.E. 1 at Count I, ¶ 6(d); Count II, ¶ 6(d); Count III, ¶ 6(d); Count IV, ¶ 6(d); Count VI, ¶ 6(d); Count VI[9], ¶ 6(d); Count VII, ¶ 6(d).) As explained below, Plaintiff fails to make out a prima facie case of retaliation. In addition, even if she had presented such a prima facie case, Defendant would still independently be entitled to summary judgment because Plaintiff has failed to present any evidence that Defendant's non-retaliatory reason for assigning her the title of "Procurement Analyst" was pretextual.

### A. Summary Judgment Is Warranted on Plaintiff's Retaliation Claim Because She Has Failed to Present a Prima Facie Case of Retaliation

A plaintiff does not have an actionable retaliation claim unless, with reference to the putative retaliation, the plaintiff suffered an adverse employment action as that term is understood under federal law. *See, e.g.*, *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). On either view of the facts on the record presented, she fails to show such an adverse employment action with regard to the retaliation issue.

First, Plaintiff has stipulated to each of the following facts:

---

[9]     The Complaint contains two counts numbered "VI".

- In December 2002, "[Ms.] Atanus requested that GSA conduct a desk audit of the work she was doing." (D.E. 44 ¶ 70.)

- In January 2003, GSA "advised [Ms.] Atanus that is was not appropriate to perform desk audits for an unassembled set of duties [Ms. Atanus's then job assignment], and that only official positions of record could undergo a desk audit." (Id. ¶ 72.)

- "[Ms.] Atanus then requested that management assign her to an official position of record so that a desk audit could be performed." (Id. ¶ 73.)

- GSA "then began, on January 17, 2003, to work with Human Resources to develop a position description specifically for the work [Ms.] Atanus was doing and the result was that [Ms.] Atanus was issued the new position of procurement analyst beginning in April 2003." (Id. ¶ 74.)

Under this view of the situation—*i.e.*, that Ms. Atanus specifically requested to be given an official position of record, and as a result, she was issued the position of procurement analyst— Plaintiff certainly has not explained how she suffered an adverse job action in having her request granted. Under this view of the facts, with all respect, Plaintiff has not explained why her claim is not defective at its root.

Taking Plaintiff's summary judgment filings broadly, however (she is not proceeding *pro se*), the Court notes that, at least at times, she seems to contend that she initially was transferred to one GS-11 position, that of Contract Specialist, and then, after filing her EEO complaint, allegedly then was reassigned to another GS-11 position, that of Procurement Analyst. (*See, e.g.*, D.E. 36 at 12; *see also id.* at 5 (explaining that the procurement analyst position was a GS-11 position).) In an effort to be as thorough as possible, the Court also will address this factual scenario.

Simply put, even if Plaintiff was switched from the Contract Specialist position to the Procurement Analyst position, she has failed to discharge her burden of explaining how that modest shift could constitute a materially adverse job action as that term is delimited by

precedent. In this regard, in *Hilt-Dyson*, the Seventh Circuit specifically stated that a materially adverse employment action means "more than a mere inconvenience or an alteration of job responsibilities." *Id.*, 282 F.3d at 465 (collecting Seventh Circuit cases; internal quotation marks omitted). The Seventh Circuit also explained that "not everything that makes an employee unhappy is an actionable adverse action." *Id.* at 466 (internal quotation marks and citation omitted).

Here, Ms. Atanus, by her own testimony, was allegedly transferred from one part of one GSA division to another "subdepartment" of the same division. (*See* 37-3, Pl. Ex. 2 (Atanus Dep.) at 59 (Ms. Atanus stating that she "was always in the contract administration branch" and that procurement is "a subdepartment of [the] contract management division.").) Ms. Atanus offers no evidence that she was even transferred to a new geographic location, and she further acknowledges that both positions were GS-11 positions. (*See, e.g.,* D.E. 36 at 2 (stating that she always was a GS-11 during 2003); *id.* at 4-5 (describing both positions as GS-11 positions); *see also* D.E. 44-2 at 22, Sims Declaration, Ex. E.) Ms. Atanus does not argue that the Procurement Analyst position was not "an official position of record," such that she could not request the "desk audit" she sought, and her express reference to the Procurement Analyst position as a "GS-1102-11" and to the Contract Specialist position also as a "GS-1102-11" assignment negates any reasonable inference that the Procurement Analyst position was a return assignment to an unassembled set of duties. (D.E. 36 at 12.)

As the Seventh Circuit has explained, this sort of *de minimis* transfer within a single governmental employment unit does not constitute the sort of materially adverse employment action that justifies "'trundling out the heavy artillery of federal [employment] discrimination law.'" *McKenzie*, 381 F.3d at 626 (quoting *Herrnreiter v. Chicago Housing Authority*, 315 F.3d

742, 745(7th Cir. 2002)). That is the case, the Seventh Circuit has explained, because "otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. The Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial." *Id.* (collecting numerous federal appellate cases; internal quotation marks and citations omitted). Thus, even if one ignores the fact that Plaintiff has otherwise stipulated to a series of facts in which the transfer to the Procurement Analyst position was the consequence of her asking for just such a position, and to look at the broader objection she at least putatively otherwise advances, there is no actionable employment action in the "subdepartmental" transfer at issue here. Summary judgment on the retaliation claim is justified on such basis alone.

**B.    Summary Judgment Is Independently Warranted on Plaintiff's Retaliation Claim Because She Has Failed to Present a Triable Showing on the Comparator Issue**

In addition, and independently, Plaintiff's putative retaliation claim otherwise fails under Seventh Circuit precedent. Under *Stone v. City of Indianapolis Public Utilities Division,* 281 F.3d 640 (7th Cir. 2002), to establish retaliation, a plaintiff must show that "after filing the charge only [s]he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though [s]he was performing his job in a satisfactory manner." *Id.,* 281 F.3d at 644; *accord, e.g., Kampmier v. Emeritus Corp.,* — F.3d —, 2007 WL 6072, *7 (7th Cir. Jan. 2, 2007) (dismissing retaliation claim where plaintiff had not properly identified a comparator) (citing *Stone,* 281 F.3d at 644).[10] If the plaintiff establishes

---

[10] *See also Kampmier v. Emeritus Corp.,* — F.3d —, 2007 WL 6072, *7 (7th Cir. Jan. 2, 2007) (teaching that "timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim") (citation omitted).

a prima facie case of retaliation in this manner, the burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. *See, e.g., Stone*, 281 F.3d at 644. If that evidence is unrebutted, the defendant is entitled to summary judgment. *Id.*

In this regard, even if Plaintiff had identified a materially adverse employment action, and the Court finds that she has not, Plaintiff's retaliation claims would still fail to present a prima facie case of retaliation because has not presented any evidence indicating that any other employee requested a "desk audit" in order to gain a promotion and was treated more favorably than she was—*e.g.*, that the other employee was not subject to a subdepartmental position change to another classified position that still could be subject to a desk audit. Nor does she identify anyone who requested a desk audit and thereafter received a promotion. (As explained below in the section concerning any putative failure-to-promote claim, Ms. Atanus's comparator showing is woefully deficient as a matter of law and logic, with her showings often based on her "gut feelings" and "educated guesses," as well as her stereotyping of national origins and religious affiliations. *See, e.g.*, D.E. 44 at 29, ¶ 10 (collecting Plaintiff's deposition testimony).) This failure to properly identify comparators is also independently disabling under *Stone* and its progeny.[11]

## III. Plaintiff Has Not Properly Advanced Any Failure to Promote Claim, and Any Such Claim Would Be Subject to Summary Judgment on The Record as Presented.

It is not entirely clear, with all respect, whether Plaintiff is suggesting that she has properly advanced a failure to promote claim under Title VII or the ADEA. Plaintiff's

---

[11] In addition, and again independently, under a set of facts which Plaintiff expressly stipulates to, her retaliation claim would fail for lack of inability to create a triable showing on the pretext issue. Specifically, Plaintiff has offered evidence that the change in Atanus title resulted from her request for a desk audit of her responsibilities (D.E. 44 ¶¶ 70-74), a request that Plaintiff admits making well prior to her filing a complaint with the EEO. (*Id.* ¶¶ 70, 74.)

Complaint (D.E. 1) identifies four employment actions that she alleges were discriminatory in violation of Title VII and/or the ADEA, but none of these claims is a failure to promote claim under either statute. *Id.* In addition, Plaintiff's "Memorandum Supporting Denial of Defendant's Motion for Summary Judgment" contains four sections (lettered C-F) that correspond to the four actions identified in the Complaint. (D.E. 36.)

However, Plaintiff also mentions in this same document, albeit only once and in passing, that she "suffered the adverse employment action[] of . . . failure to be promoted," while never making an argument in support of such a claim. (D.E. 36 at 7.) In the interests of completeness, to the extent any failure to promote claim is suggested in the summary judgment response, it would fail for multiple, independent reasons, as explained below.

First, Plaintiff may not amend her complaint through arguments in her brief in opposition to a summary judgment motion. *See, e.g., Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)). Plaintiff also did not file any motion to amend her complaint to properly include such an allegation, but any such motion would have been denied as untimely and as unduly prejudicial to GSA under the circumstances, given that discovery has already closed. *Accord, e.g., Hindo v. University of Health Sciences/The Chicago Medical School*, 65 F.3d 608, 615 (7th Cir. 1995) (collecting cases); *Cont'l Bank v. Meyer*, 10 F.3d 1293, 1298 (7th Cir. 1993).

Second, and independently, most of the references to other promotions in Plaintiff's deposition occurred long before Plaintiff filed any EEO Complaint. Plaintiff did not file her EEO Complaint until March 5, 2003 (D.E. 44 ¶ 31 (supplemental facts)); therefore her references to others' promotions between 1997 and 2001 are time-barred, as she had 45 days after such promotions to complain to the EEO if she felt she deserved those positions, 29 C.F.R. §

1614.105(a)(1), and she offers no suggestion as to why any limitations period should be tolled. One of the individuals Plaintiff alludes to (Jacqueline Roberts) was promoted after 2001, but that occurred on March 9, 2003 (*id.* ¶ 30 (supplemental facts)), which was after Plaintiff filed her EEO charge.

Third, and again independently, Plaintiff has failed to provide any evidence that would allow the Court to determine that the individuals Plaintiff identifies as having been promoted instead of her were "similarly situated" to Plaintiff. As alluded to earlier, Plaintiff's comparator discussion is wholly deficient, as it typically rests on speculation, "gut feelings," and caricatures of various ethnic and religious groups. For example, she concluded that one coworker was of German ancestry because the woman likes sauerbraten and Plaintiff speculated that the woman was Lutheran because "Germans are Lutherans." (D.E. 37-3 (Atanus Dep.) at 132-33.) Plaintiff testified that another woman, Dorothy Price, is Jewish "[b]ecause of her name. Because of her mannerisms," and because she brought matzoh ball soup to a Christmas party. (*Id.* at 139-40.) In this regard, Plaintiff found further confirmation that Ms. Price was Jewish by virtue of the fact that she apparently did not speak to Plaintiff a great deal: "If I was Jewish she would have talked to me." (*Id.* at 140.) This is not the sort of comparator showing that federal law requires.

Plaintiff even claimed that she knew some of her colleagues had "no religion" because she viewed them as evil:

Q. Denise Henderson. What's her race?

A. Black.

Q. Do you know what her religion is?

A. No religion.

Q. How do you know that?

A.  She's very evil what she did to me, wrongfully removing me. Anyone with religion wouldn't do that. No religion.

\*     \*     \*

Q.  Portia Nash. Is that another woman?

A.  And by looking at her I could see her religion. Very evil, very discriminatory against me.

[. . . .]

Q.  Do you know what Portia Nash's religion is?

A.  No religion.

Q.  And how do you know that?

A.  I don't think she has any religion.

Q.  I asked how you knew that.

A.  Just my inner gut feeling.

Identifying putative comparators is an important part of any prima facie showing under the *Mc Donnell Douglas* analysis. Such a showing cannot rest on wild speculation and conjecture. In addition, as stated above, a "similarly situated" individual is one who is "directly comparable to [the plaintiff] in all material respects." *Hudson*, 375 F.3d at 561 (internal quotation marks and citation omitted). To determine whether two employees are directly comparable, a court looks at all the relevant factors, which typically include, *inter alia*, whether the employees were subordinate to the same supervisor; had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision; and any other relevant factors. *See, e.g., Hill v. Stoughton Trailers, LLC,* 445 F.3d 949, 952 (7th Cir. 2006) (collecting cases). Plaintiff's wild speculations about people's respective religions and ancestries are exacerbated by her failure to adduce evidence about all the other factors that one would reasonably consider in assessing promotional candidates—*e.g.,* the

performance records of the individuals, their respective qualifications, whether promotional decisions were made by the same individuals, etc.[12]

Finally, and again independently, to the extent Plaintiff would complain of the promotion of Ms. Jacqueline Roberts in March 2003, it appears that Ms. Roberts was promoted to a GS-11 position, not to a GS-12 position. *See* D.E. 44-2, Ex. C (GSA notification of personnel action for Ms. Jacqueline Roberts, reflecting at item 18 that she was promoted to a GS-11 position); *id.,* Sims Declaration ¶ 7.) This too would offer no basis for relief, given that Ms. Atanus then also was a GS-11 and had adjusted basic pay (perhaps as a result of her seniority) that was over $10,000 more than Ms. Roberts received post-promotion. *See* D.E. 44-2, Ex. C (GSA notification of personnel action for Ms. Roberts, item 20C ($49,917 salary); D.E. 44-2, Ex. E (GSA notification of personnel action for Plaintiff, reflecting that in the spring of 2003, in both contract specialist and procurement analyst positions, she was receiving a salary of $60,735).

Thus, for the reasons stated above, any putative failure-to-promote claim fails on multiple, independent grounds. Plaintiff has failed to present a triable case on such basis.

---

[12] In this regard, Plaintiff does note that one putative comparator, Ms. Price (*i.e.*, the woman who supposedly is Jewish because she does not speak to Plaintiff much and has a Jewish-sounding name), "does not have a college education," but this is not nearly enough to determine whether Plaintiff and Ms. Price were similarly situated with regard to the factors identified in precedent. Nor does one single piece of information (*i.e.*, that a putative comparator seemingly has lesser educational credentials than a plaintiff) suggest that the plaintiff is actually comparable or superior to the lesser-educated individual in terms of employment performance or any of the other factors (*e.g.*, ability to get along with others) that typically inform a promotional decision.

## CONCLUSION

For the multiple, independent reasons identified above, the Court grants Defendant's

motion for summary judgment. (D.E. 32)

So Ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: _1/24/07_